Stewart R. Pollock (SBN – 301356)
spollock@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Attorney for Plaintiff and the Putative Class*

[Additional counsel appear on the signature page.]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAVID BURNS, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>STANFORD UNIVERSITY, PAC-12 CONFERENCE, and THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>*Defendants.* | Case No.: 3:16-cv-3805<br><br>**COMPLAINT FOR:**<br><br>1. **Negligence;**<br>2. **Fraudulent Concealment;**<br>3. **Breach of Express Contract;**<br>4. **Breach of Implied Contract;**<br>5. **Breach of Third-Party Express Contract; and**<br>6. **Unjust Enrichment.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiff David Burns brings this Class Action Complaint and Demand for Jury Trial against Defendants Stanford University ("Stanford"), Pac-12 Conference ("Pac-12") and the National Collegiate Athletic Association ("NCAA") to obtain redress for all persons injured by their reckless disregard for the health and safety of generations of Stanford student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**NATURE OF THE ACTION**

1.      Nearly one hundred thousand student-athletes sign up to compete in college football each year and it's no surprise why. Football is America's sport and Plaintiff and a Class of football players (defined below) were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching these kids play. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each game, these players—often 18 year old freshmen in college—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going. But Defendants Stanford, Pac-12, and the NCAA have kept their players and the public in the dark about an epidemic that was slowly killing their athletes.

2.      During the course of a college football season, athletes can receive more than 1,000 impacts greater than 10g's (gravitational forces). The majority of football-related hits to the head exceed 20g's, with some approaching 100g's. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and you weren't wearing a seatbelt, the force of you hitting the windshield would be around 100g's. That means that each season, thousands of student-athletes are subjected to the equivalent of several hundred car accidents.

3.      Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological events that could slowly strangle their brains.

1    4.    Unfortunately, for decades, Defendants Stanford, Pac-12, and the NCAA knew about

2    the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive

3    injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college

4    football, but actively concealed this information to protect the very profitable business of "amateur"

5    college football.

6    5.    While in school, Stanford football players were under Defendants Stanford's, Pac-

7    12's, and the NCAA's care. But, unfortunately, Defendants Stanford, Pac-12, and the NCAA did

8    not care about the off-field consequences that would haunt their students for the rest of their lives.

9    6.    Despite knowing for decades of a vast body of scientific research describing the

10   danger of TBIs, Defendants failed to implement procedures to protect Plaintiff and other Stanford

11   football players from the long-term dangers associated with them. They did so knowingly and for

12   profit.

13   7.    As a direct result of Defendants' actions (or lack thereof), Plaintiff and a Class of

14   former players (defined below) now suffer from neurological and cognitive damage, including

15   symptoms of traumatic encephalopathy.

16                                          **PARTIES**

17   8.    Plaintiff David Burns (f/k/a David Nagler), is a natural person and citizen of the

18   State of California.

19   9.    Defendant Stanford is a private university located at 450 Serra Mall, Stanford,

20   California 94305. Defendant Stanford conducts business throughout this District, the State of

21   California, and the United States.

22   10.   Defendant Pac-12 Conference is a collegiate athletic conference with its principal

23   office located at 360 3rd Street, 3rd Floor, San Francisco, California 94107. Defendant Pac-12

24   conducts business throughout this District, the State of California, and the United States.

25   11.   Defendant NCAA is an unincorporated association with its principal office located at

26   700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA conducts business

27   throughout this District, the State of California and the United States.

28

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of exceptions under that subsection apply to this action.

13. This Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts here, and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated in part from this District.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants Stanford and Pac-12 reside in this District and because Defendants conduct significant business in this District, including establishing consumer and business contracts, marketing, and recruiting here.

**INTRADISTRICT ASSIGNMENT**

15. Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

**FACTUAL BACKGROUND**

**I.      The NCAA, Pac-12, and Stanford Had a Duty to Protect Their Student-Athletes.**

16. Defendant NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including in the Pac-12 and the football program at Stanford. According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes – on the field, in the classroom, and in life."[1]

17. To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition. Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known schools, with high ranking teams, larger budgets, better facilities, and more athletics scholarships.

---

[1] Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, http://www.ncaa.org/about/who-we-are/membership (last visited June 20, 2016).

18.     Each NCAA Division is composed of several "conferences" to facilitate regional league play. Stanford is a Division I football team in the Pac-12 Conference (known as the Pac-8 during Plaintiff's tenure with Stanford's football team). The Pac-12 operates in the western United States and participates in 22 NCAA sports with members located in Arizona, California, Colorado, Oregon, Utah, and Washington. Stanford has one of the most dominant football programs in the United States. Stanford football attracts top high school talent from across the nation and enjoys a national television audience. Stanford football generates millions of dollars in revenue for the school each year and consistently ranks among the top teams in the country.

19.     Collectively, Defendants govern and regulate the Stanford football program and owe a duty of care to safeguarding the well-being of its student-athletes.

20.     In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[2] The IAAUS was specifically formed for this purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the association was established.[3] As such, the genesis of the NCAA was for a singular goal: student-athlete safety.

21.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives[, but that each] division creates its own rules that follow the overarching principles of the NCAA."[4]

---

[2]     About the NCAA, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, http://www.ncaa.org/about (Last visited June 20, 2016).
[3]     In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.
[4]     Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, http://www.ncaa.org/about/who-we-are/membership (last visited June 20, 2016).

22.     The overarching principles of the NCAA, including its purported commitment to safeguarding its student-athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a)     To initiate, stimulate and improve intercollegiate athletics programs for student-athletes;
>
> (b)     To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b)(emphasis added).

23.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

24.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> **2.2.3 Health and Safety.**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

25.     To accomplish this purported purpose, NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions, including athletic conferences like the SEC, are required to abide by the NCAA rules

1  and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply

2  with all applicable rules and regulations of the Association in the conduct of its intercollegiate

3  athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and

4  groups representing the institution's athletics interests shall comply with the applicable Association

5  rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, §

6  2.8.1.

7       26.    The NCAA publishes a health and safety guide termed the Sports Medicine

8  Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's

9  official policies and guidelines for the treatment and prevention of sports-related injuries, as well as

10  return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who

11  sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury

12  from athletics participation."[5]

13       27.    To provide member institutions with the tools that they need to comply with NCAA

14  legislation, the NCAA Constitution promises that the "Association shall assist the institution in its

15  efforts to achieve full compliance with all rules and regulations. . . ." NCAA Const., Art. 2, § 2.8.2.

16       28.    Likewise, according to the NCAA Constitution, a member conference is entitled to

17  all of the privileges of active members, except the right to compete in NCAA championships. *See*

18  NCAA Const., Art. 3, § 3.02.3.2. Member "conferences of [the NCAA] agree to administer their

19  athletics programs in accordance with the constitution, bylaws and other legislation of the

20  Association." NCAA Const., Art. 3, § 3.3.4.1.

21       29.    The NCAA, therefore, holds itself out as both a proponent of and authority on the

22  treatment and prevention of sports-related injuries upon which the student-athletes, Pac-12, and

23  Stanford (*i.e.*, member institutions) can rely upon for guidance on player-safety issues.

24       30.    As a member conference, Pac-12 is charged with implementing and enforcing those

25  guidelines in a meaningful way to protect the health and safety of Stanford football players,

26       [5]    *See, e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL

27  COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at*
https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

28

1   including Plaintiff.

2       31.     Likewise, as a member institution, Stanford is charged with implementing and

3   enforcing those guidelines in a meaningful way to protect the health and safety of Stanford football

4   players, including Plaintiff.

5       32.     As members of the NCAA, Pac-12 and Stanford are obligated to help protect the

6   health and safety of its student-athletes and agreed to abide by the NCAA Constitution.

7       33.     As compared to Plaintiff and other Stanford football players, Defendants were in

8   superior positions to know of and mitigate the risks of concussions and other TBIs.

9   **II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.**

10      34.     Throughout the twentieth century and into the twenty-first century, studies have

11  firmly established that repetitive and violent impacts to the head can cause concussions with a

12  heightened risk of long term traumatic brain injuries (or TBI), including memory loss, dementia,

13  depression, CTE, Alzheimer's disease, Parkinson's disease, and other related symptoms. To better

14  understand the results of these studies, a brief introduction to concussions in football follows.

15      *A.     An Overview of Concussions in Football.*

16      35.     A concussion is a traumatic brain injury caused by an impact that causes the head

17  and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist

18  in the skull, damaging brain cells and creating chemical changes in the brain.

19      36.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a

20  hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the

21  skull. But relatively minor impacts—including not only direct blows to the head but also blows to

22  the body and movements that cause the neck to whiplash—can move the brain enough to press

23  through the spinal fluid, knock against the inside of the skull, and cause concussions.

24      37.     Concussions typically occur when linear and rotational accelerations impact the

25  brain through either direct impacts to the head or indirect impacts that whiplash the head. During

26  the course of a college football season, studies have shown athletes can receive more than 1,000

27  impacts greater than 10g (or gravitational) force. This is slightly more force than a fighter pilot

28

receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20g's.

38.     Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s: in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning."[6]

i.     Concussion Symptoms.

39.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss, such as trouble remembering things that happened right before and after the injury;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

- feeling anxious or irritable for no apparent reason; or

- feeling overly tired.

40.     A student-athlete may not recognize the signs or symptoms of a concussion, or, more likely, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

---

[6]     Malcolm Gladwell, Offensive Play, *The New Yorker* (October 19, 2009) http://www.newyorker.com/magazine/2009/10/19/offensive-play.

ii.    Post-Concussion Treatment.

41.    After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury.

42.    The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

43.    Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

44.    Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions are anything but temporary.

B.    *Studies Confirm the Dangers and Long-Term Effects of Concussions.*

45.    The two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau

46.    Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters and Nash killed themselves, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristic of CTE, which is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma.

47. Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94 (96%) of autopsied brains of former NFL players. He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

48. Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

49. Unfortunately, studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions and other TBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

50. For instance, in 1928, pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out our or who had suffered a considerable impact to the head. *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

51. Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function. As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline.

52. Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play. Then nearly twenty years after that, in 1952, an article published in the *New England Journal of Medicine* first recommended a three-strike rule for concussions in football, that recommended that players cease to play football permanently after receiving their third concussion.

53. Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. Hughes and Hendrix examined how

severe impacts affected brain activity in football players by utilizing electroencephalograms (commonly known as "EEGs"). Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling that the skull cannot accommodate.

54. Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

55. As a result of these, and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

56. By 1991, Dr. Cantu, the American Academy of Neurology, and Colorado Medical Society developed return-to-play criteria for football players suspected of sustained head injuries.

57. In 2003, a NCAA concussion study concluded that football players who had

1    previously sustained a concussion were more likely to have future concussion injuries. Another

2    2003 NCAA concussion study concluded that collegiate football players "may require several days

3    for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and

4    that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events

5    that can adversely affect cerebral function for several days to weeks." [7]

6         58.    Following these studies, a National Athletic Trainers' Association position statement

7    in 2004 recommended baseline cognitive and postural-stability testing, as well as return-to-play

8    recommendations including holding out athletes who exhibit symptoms of a suspected head injury.

9         59.    Building upon that, a convention of neurological experts met in Prague in 2004 with

10    the aim of providing recommendations for the improvement of safety and health of athletes who

11    suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-

12    date research. These experts recommended that a player never be returned to play   symptomatic,

13    and coined the phrase, "when in doubt, sit them out."

14         60.    Ultimately, while the NCAA, Pac-12, and Stanford knew for decades of the harmful

15    effects of TBI on student-athletes, they ignored these facts and failed to institute any meaningful

16    methods of warning and/or protecting the student-athletes, including the football players. For

17    Defendants, the continued expansion and operation of college football was simply too profitable to

18    put at risk.

19 **III.    The NCAA and Pac-12, and Stanford Breached Their Duties to Their Student-Athletes**

20 **By Concealing the Dangers of Concussions and Refusing to Implement Reasonable Concussion Management Protocols.**

21         61.    For decades, the NCAA, Pac-12, and Stanford have been aware that severe head

22    impacts can lead to long-term brain injury, including memory loss, dementia, depression, and CTE.

23    Unfortunately, while the NCAA, Pac-12, and Stanford knew about the harmful and devastating

24    effects of these sub-concussive and concussive injuries, they actively concealed these facts from

25    student-athletes and the public.

26 ────────────────

[7]      Michael McCrea, *et al.*, Acute Effects and Recovery Time Following Concussion in

27 Collegiate Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at*

28 http://jama.jamanetwork.com/article.aspx?articleid=197668.

62. In fact, on information and belief, during every decade referenced above, the NCAA, Pac-12, and Stanford were advised by physicians and researchers of the severe risks associated with playing football, including the risks associated with TBI.

63. Rather than inform their student-athletes of these risks or implement protocols to protect and safeguard them from TBI-related injuries (as, at least, the NCAA and Pac-12 promised to do through the NCAA Constitution, among other things), the NCAA, Pac-12, and Stanford failed to adopt any of the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

64. Instead, and in complete disregard of the vast body of known scientific evidence and the resources and authority possessed by NCAA, Pac-12, and Stanford, up until 2010, Defendants orchestrated an approach to football practices and games that:

- ignored the medical risks to Plaintiff and other Stanford football players;

- aggravated and enhanced the medical risks to Plaintiff and other Stanford football players;

- failed to educate Plaintiff and other Stanford football players of the link between TBIs in amateur football and chronic neurological damage, illnesses, and decline;

- failed to implement or enforce any system that would reasonably have mitigated, prevented, or addressed TBIs suffered by Plaintiff and other Stanford football players; and

- failed to timely implement "return to play" guidelines for student-athletes who sustain concussions.

65. Indeed, the NCAA didn't even acknowledge the dangers of concussions in its Sports Medicine Handbook until 1994 when it added what it captioned "Guideline 2o": "Concussions and Second Impact Syndrome." But rather than mandating a specific treatment protocol for member institutions, Guideline 2o left concussion management and treatment to the individual team's discretion.

66. For example, while the 1998–99 version of Guideline 2o reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," it

also stated that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

67.     In this way, Guideline 2o acted as a liability cover for the NCAA without any NCAA enforcement activity to actually protect student-athletes.

68.     As such, despite having actual knowledge of the dangers of concussions, the NCAA refused to implement, endorse, or even recommend specific concussion grading scale or return-to-play criteria.

69.     To make matters worse, Stanford completely ignored Guideline 2o and failed to adopt or implement any concussion safety measures or return to play guidelines whatsoever for decades. In fact, Stanford's football program had no formal concussion-related safety measures or protocols until 2010.

70.     Moreover, neither the NCAA nor the Pac-12 enforced—and Stanford did not comply with—Guideline 2o's statement that: "A student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

71.     Ultimately, until 2010, Defendants failed to:

- implement guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or took any action to educate student-athletes about the risks of repetitive head injuries;

- conduct a football program that proactively encouraged Plaintiff and other Stanford football players to avoid head injuries, instead compelling players to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms. For instance, Stanford coaches demanded that Stanford football players, including Plaintiff, forego their own self-interest and continue play despite sustaining head injuries themselves, or inflicting head injuries on other players for the purpose of advancing Stanford football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Stanford, Pac-12, and NCAA; and

- contact Plaintiff and other Stanford football players after they left Stanford to inform them that had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for Stanford.

72. It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

73. Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

74. The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

75. Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

76. However, this policy too is flawed: due to the very nature of concussions, student-athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. As the NCAA, Pac-12, and Stanford have long known, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly. A player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as NCAA, Pac-12, or Stanford, to identify concussive injuries in real-time and take appropriate remedial actions. For an injured student, Defendants stand in the role of a guardian tasked with making decisions in the student's best interest. For decades, Defendants have failed to fulfill that role and have instead acted

1     in their own best interest, all to the lifelong detriment of thousands of 18 to 22 year olds.

2           77.    In the end, these (still deficient) policies were implemented far too late for Plaintiff

3     and the Class, who suffered reasonably foreseeable harm as a result of the NCAA's, Pac-12's, and

4     Stanford's actions.

5                      **FACTS SPECIFIC TO PLAINTIFF BURNS**

6           78.    Plaintiff David Burns played football as a strong safety and wide receiver from

7     1972–1974 at Stanford. During hitting drills, regular practices, and games, Burns suffered several

8     concussions at Stanford. For instance, Burns sustained consistent and significant head blows in

9     practice his freshman year playing on the scout team defense against the first string varsity players.

10           79.    Stanford never provided any type of appropriate medical treatment during these

11     incidents. Burns would simply stay on the field or be sidelined until he could stabilize and pull

12     himself together, at which point he was promptly put back into the game or practice. Several times

13     after games, school staff were forced to cut the lock off of Burns's locker due to his inability to

14     remember the combination or unlock the device. Similarly, he was once found disoriented—still in

15     his uniform—wandering around in the women's side of the athletic department looking for the

16     locker room.

17           80.    His sophomore year, Burns switched to offense in the hopes of reducing the head

18     trauma that he was exposed to. Although the concussion events lessened to 3 or 4 that year, they

19     were generally more serious owing to the fact that, on offense, one often has no warning that an

20     impact, whether with another player, or the ground, is about to occur.

21           81.    One day in practice, Burns was diving for a pass at the same time as a linebacker

22     from the opposite direction. The tops of their heads met and Burns lost consciousness and received

23     a compression injury to his cervical vertebrae that went undiagnosed until years later. In one

24     particular game against California Polytechnic State University (Cal Poly) during his sophomore

25     year, Burns tackled an opposing player on a punt. It was a routine play but by this point Burns was

26     getting concussed more and more easily with each trauma. He has no recollection of approximately

27     30 minutes of the game, and "came to" on the sidelines having played, and played well by all

28

1  accounts, during his "blackout". For the rest of the game, however, Burns believed he was at San

2  Jose State and became agitated when the bus arrived at the airport prompting a visit from the trainer

3  who told Burns's friends on the team to keep him awake that night.

4      82.    Over time, Burns began to experience the consequences of these concussions. He

5  began an ongoing struggle with memory loss, impulse problems, severe fatigue, sleeping problems,

6  and other debilitating issues. Burns has undergone various therapies and treatments, in an effort to

7  find answers that neither Stanford nor the NCAA would ever provide.

8      83.    At all times since the inception of Stanford's football program, through at least 2010,

9  there were no concussion management protocols or policies of any kind in place at Stanford to

10 address and treat concussions sustained by student-athletes during practice and in games.

11     84.    In fact, although Plaintiff sustained repetitive concussive and sub-concussive hits in

12 practices and games for the profit and promotion of Stanford and the NCAA and Pac-12,

13 Defendants failed to adopt or implement any concussion management safety protocols or return to

14 play guidelines whatsoever during his time on Stanford's football team.

15     85.    Accordingly, every time Plaintiff suffered a concussive or sub-concussive hit, he

16 would quickly be returned to the field of play.

17     86.    Likewise, each time Plaintiff suffered a concussive or sub-concussive hit, he was

18 deprived by Defendants of the appropriate medical attention and treatment that they knew was

19 necessary to monitor, manage, and mitigate risks associated with TBIs.

20                              **CLASS ALLEGATIONS**

21     87.    **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil

22 Procedure 23(b)(3) on behalf of himself and a Class defined as follows:

23          All individuals who participated in Stanford's varsity football program
            between 1959 and 2010.

24     The following people are excluded from the Class: (1) any Judge or Magistrate presiding

25 over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

26 successors, predecessors, and any entity in which the Defendants or their parents have a controlling

27 interest and its current or former employees, officers and directors; (3) persons who properly

28

---

execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

88.     **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of Stanford football players fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

89.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

(a)     Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)     Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

(c)     Whether Defendants' conduct as alleged herein constitutes a breach of duty;

(d)     Whether Defendants' conduct as alleged herein constitutes negligence;

(e)     Whether Defendants' conduct as alleged herein constitutes breach of contract;

(f)     Whether Defendants' conduct as alleged herein constitutes fraudulent concealment;

(g)     Whether Defendants' were unjustly enriched at the expense of Plaintiff and the Class; and

(h)     Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

90.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

91.     **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

92.     **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Individually and on Behalf of the Class as Against All Defendants)

93.     Plaintiff incorporates by reference the foregoing allegations.

94.     From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its

governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players. Defendant Pac-12 shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

95.     Defendant Stanford also assumed similar duties to its football players, including Plaintiff.

96.     The duties of all Defendants included an obligation to supervise, regulate, and monitor the rules of Stanford football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to Stanford football players.

97.     Defendants NCAA and Pac-12 had a duty to educate Stanford and Stanford football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. The NCAA's and Pac-12 duty further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

98.     All Defendants had a duty not to conceal material information from Stanford football players, including Plaintiff.

99.     Defendants breached their duties to Plaintiff by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in locker rooms, and in the weeks and months after Stanford football players sustained TBIs, as well as providing treatment for the latent effects of TBI. These failings include, but are not limited to:

(a)     failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

(b)     failing to inform the student football players of the dangers of concussive and sub-concussive injuries;

(c)     failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;

(d)     failing to implement procedures to monitor the health of football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to inform the football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Plaintiff left Stanford.

100.    Defendants breached their duties to Plaintiff by fraudulently concealing and/or failing to disclose and/or failing to recognize and/or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

101.    Stanford, in particular, breached its duty to Plaintiff by actively teaching and encouraging Stanford football players to inflict head injuries on themselves and others as an effective way to play football.

102.    Plaintiff relied upon the guidance, expertise, and instruction of Defendants in understanding risks associated with the serious and life-altering medical issue of concussive and sub-concussive risk in football.

103.    At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Plaintiff, Defendants knew or should have known that Plaintiff would act and rely upon the guidance, expertise, and instruction of Defendants on this crucial medical issue, while at Stanford and thereafter.

104.    Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place,

1  including the release of small amounts of chemicals within the brain, such as protein, which is a

2  signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk

3  syndrome") studied and reported by Harrison Martland in 1928.

4       105.    Plaintiff experienced repetitive sub-concussive and concussive brain impacts during

5  his college football career that significantly increased his risk of developing neurodegenerative

6  disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar

7  cognitive-impairing conditions.

8       106.    The repetitive head accelerations and hits to which Plaintiff was exposed presented

9  risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and

10  concealment, the risks of harm to Plaintiff would have been materially lower, and Plaintiff would

11  not have sustained the brain damage from which he currently suffers.

12       107.    The repetitive head impacts and TBIs Plaintiff sustained while playing football at

13  Stanford resulted in neuro-cognitive and neuro-behavioral changes in Plaintiff, including neuro-

14  cognitive disability, decline, and forgetfulness, all of which will require future medical care.

15       108.    As a direct and proximate result of Defendants' negligence, Plaintiff has incurred

16  damages in the form of permanent brain damage, emotional distress, past and future medical costs,

17  health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, and

18  other damages. Plaintiff will likely incur future damages caused by Defendants' negligence.

19       109.    As a result of their misconduct, Defendants are liable to Plaintiff for the full measure

20  of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks

21  actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses,

22  and costs to the extent allowable.

23                          **SECOND CAUSE OF ACTION**
                           **FRAUDULENT CONCEALMENT**
24               **(Individually and on Behalf of the Class as Against All Defendants)**

25       110.    Plaintiff incorporates by reference the foregoing allegations.

26       111.    Defendants knew that repetitive head impacts in football games and full-contact

27  practices created a risk of harm to student-athletes that was similar or identical to the risk boxers'

28

1  faced when receiving repetitive impacts to the head during boxing practices and matches, and

2  professional football players, many of whom were forced to retire from professional football

3  because of head injuries.

4        112.    Defendants were aware of and understood the significance of the published medical

5  literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of

6  short-term and long-term brain injury associated with repetitive traumatic impacts to the head—the

7  likes of which Stanford football players were exposed to.

8        113.    Defendants were willfully blind to and/or knowingly concealed from Plaintiff and

9  the Class the risks of TBI in NCAA football games and practices, including the risks associated

10  with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

11        114.    Through concealment of material facts, Defendants intended to induce a false belief,

12  under circumstances creating a duty to speak. Defendants intended to induce a false belief that

13  Plaintiff and the Class should continue to play football and should not be prevented from playing

14  football after a concussion or several concussions that should have required time to heal.

15        115.    Plaintiff and the Class could not have reasonably been expected to know or discover

16  the truth about the risks associated with sub-concussive or concussive injuries, or were prevented or

17  mislead from obtaining such truthful information. Plaintiff and the Class were under the care and

18  treatment of Defendants and justifiably relied on their silence as representing facts that did not exist.

19        116.    Given Defendants' superior and unique vantage point, Plaintiff reasonably looked to

20  Defendants for guidance on head injuries and concussions, including the later-in-life consequences

21  of the repetitive head impacts he sustained while a football player at Stanford.

22        117.    The concealed information was such that Plaintiff and the Class would have acted

23  differently if they had been aware of the material facts known to, and concealed by, Defendants.

24  Had Plaintiff and members of the Class known the full facts in Defendants' possession, they would:

25  not have continued to play after an injury; or would have taken additional time to allow their brain

26  injuries to heal before returning to play; or would have taken additional precautions while playing

27  football; or would not have continued to play college football at all. Despite Defendants'

28

1  knowledge, they failed to act reasonably by developing appropriate guidelines or rules regarding

2  return to play criteria and other safety procedures. The Defendants' inaction and concealment

3  increased the risk of long-term injury and illness in their student-athletes.

4        118.    As a direct and proximate result of Defendants' knowing concealment and/or willful

5  blindness, Plaintiff has suffered and will continue to suffer substantial injuries, emotional distress,

6  pain and suffering, and economic and non-economic damages that are ongoing and continuing in

7  nature.

8        119.    As a result of their misconduct, Defendants are liable to Plaintiff for the full

9  measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class,

10  seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable

11  attorneys' fees, expenses, and costs to the extent allowable.

12  **THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**

13  **(Individually and on Behalf of the Class as Against Defendant NCAA)**

14      120.    Plaintiff incorporates by reference the foregoing allegations.

15      121.    As a football player at Stanford, an institution governed by the NCAA, Plaintiff was

16  required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation.

17  The contract required Plaintiff to complete a form affirming that he has read the NCAA regulations

18  and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution,

19  Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA

20  Division bylaws.

21      122.    In exchange for Plaintiff's and the Class's agreement, the NCAA promised to

22  perform certain services and functions, including, inter alia:

23        • conducting intercollegiate athletics in a manner designed to protect and
enhance the physical and educational welfare of student-athletes;

24  

25        • requiring that each member institution protect the health of, and provide a
safe environment for, each of its participating student-athletes;

26        • requiring that each member institution must establish and maintain an
environment in which a student-athlete's activities are conducted as an

27        integral part of the student-athlete's educational experience.

28

123. By signing and agreeing to abide by NCAA regulations, and thereafter participating in a NCAA sanctioned sports program in accordance with such regulations, Plaintiff and the Class fulfilled their contractual obligations to the NCAA.

124. As described in the foregoing allegations, the NCAA breached the Parties' agreement by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. The NCAA further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long- term risks of concussions and concussion-related traumatic injury.

125. Plaintiff entered into a written agreement with NCAA in which he committed to play football at Stanford, to attend Stanford as a student, and to comply with all codes of conduct and obligations as both a football player and student at Stanford.

126. Plaintiff fulfilled his obligations under the contract by playing football at Stanford.

127. NCAA's contractual breaches with Plaintiff and the Class caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

128. As a result of their misconduct, Defendant NCAA is liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(Individually and on Behalf of the Class as Against all Defendants)**

129. Plaintiff incorporates by reference the foregoing allegations.

130. To the extent that an express written contract cannot be established among Plaintiff, the Class, and Defendants, the facts set forth above support the finding of an implied contract.

131. Under the implied contract, student-athletes agreed to be bound by NCAA and Pac-12 rules and regulations in exchange for their participation in NCAA and Pac-12 controlled athletic programs, including Stanford football program. As a condition of the implied contract, the NCAA

1    agreed to abide by, and Pac-12 agreed to implement, the promises set forth in its own Constitution

2    and Bylaws, as described above.

3          132.    Plaintiff and the Class indicated their acceptance of the contract, and further, fully

4    performed under the contract, by participating in Stanford football program in accordance with

5    NCAA and Pac-12 rules and regulations.

6          133.    Defendants breached their implied contractual duties by failing to ensure that

7    student-athletes were provided with a safe environment in which to participate in football activities.

8    Defendants further breached their contracts by concealing and/or failing to properly educate and

9    warn players about the symptoms and long-term risks of concussions and concussion-related

10    traumatic injury.

11          134.    Defendants' breach caused Plaintiff and the Class to suffer physical injury and

12    damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses,

13    lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur

14    future damages caused by Defendants' breaches.

15          135.    As a result of their misconduct, Defendants are liable to Plaintiff for the full measure

16    of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks

17    actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees,

18    expenses, and costs to the extent allowable.

19
20

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class as**
**Third-Party Beneficiaries as Against Defendants NCAA and Stanford)**

21

22          136.    Plaintiff incorporates by reference the foregoing allegations.

23          137.    To the extent that no express or implied contract is found to exist between Plaintiff

24    and Defendants, an express contract existed between the NCAA and Stanford.

25          138.    Under the terms of that contract, Stanford agreed to abide by the applicable NCAA

26    rules and regulations, including those expressly set forth in the NCAA's Division Manuals,

27    Constitution, and Bylaws.

28

1   139.   Under the terms of that contract, as described in the NCAA Constitution and

2   encompassed within the NCAA Division Manuals, Stanford and NCAA agreed to, among other

3   things, conduct intercollegiate athletic programs in a manner designed to protect and enhance the

4   physical and educational well-being of student athletes; and protect the health of and provide a safe

5   environment for each of its participating student-athletes.

6   140.   Plaintiff and the Class are the intended third-party beneficiaries of the contract

7   between the NCAA and Stanford. Such an intention can be found in the express language of the

8   NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA

9   organization.

10   141.   NCAA and Stanford breached their contractual duties owed to Plaintiff and the Class

11   under that contract by: (1) failing to implement or require rules of play and return to play criteria to

12   minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to

13   adequately inform and educate Stanford football players on the symptoms and long-term dangers of

14   concussions and concussion-related injuries.

15   142.   As a direct result of NCAA's and Stanford's breach, Plaintiff and the Class suffered

16   physical injury and damages in the form of past, ongoing, and future medical expenses, and other

17   out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the

18   Class will likely incur future damages caused by NCAA's and Stanford's conduct.

19   143.   As a result of their misconduct, Defendant NCAA and Stanford are liable to Plaintiff

20   for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf

21   of the Class, seeks actual damages for NCAA's and Stanford's contractual breaches, as well as

22   interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

23                             **SIXTH CAUSE OF ACTION**
                                  **UNJUST ENRICHMENT**
24                         (***In the Alternative to Breach of Contract***)
                  <u>**(Individually and on Behalf of the Class as Against All Defendants)**</u>
25

26   144.   Plaintiff incorporates by reference the foregoing allegations, excluding paragraphs

27   120–143.

28

1    145.    Defendants receive significant revenues from the collegiate football played by

2  student-athletes. These revenues include, but are not limited to, contractual revenues from

3  broadcasting, merchandising agreements, and ticket sales.

4    146.    Defendants appreciate and have knowledge of such benefits.

5    147.    Under principles of equity and good conscience, Defendants should not be

6  permitted to retain the profits they receive at the expense of Plaintiff and the Class while refusing to

7  pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to

8  prevent such injuries.

9    148.    Plaintiff, individually and on behalf of the Class, seeks restitution and/or

10  disgorgement of all monies Defendants have unjustly received as a result of its conduct alleged

11  herein.

12                              **PRAYER FOR RELIEF**

13    WHEREFORE, Plaintiff David Burns, individually and on behalf of the Class, requests that

14  the Court enter an Order providing for the following relief:

15    A.    Certify this case as a class action on behalf of the Class defined above, appoint

16  Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

17    B.    Declare that Defendants' actions, as set out above, constitute negligence, fraudulent

18  concealment, breach of contract, and unjust enrichment;

19    C.    Award all economic, monetary, actual, consequential, compensatory, and punitive

20  damages caused by Defendants' conduct, including without limitation damages for past, present,

21  and future medical expenses, other out of pocket expenses, lost time and interest, lost future

22  earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused

23  by Defendants' misconduct;

24    D.    Award Plaintiff and the Class their reasonable litigation costs and attorneys' fees;

25    E.    Award Plaintiff and the Class pre- and post-judgment interest, to the extent

26  allowable;

27

28

1      F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of

2  Plaintiff and the Class; and

3      G.      Award such other and further relief as equity and justice may require.

4  **JURY DEMAND**

5      Plaintiff demands a trial by jury for all issues so triable.

6                                 Respectfully submitted,

7                                 **DAVID BURNS**, individually and on behalf of all

8                                 others similarly situated,

9  Dated: July 7, 2016            By: /s/ Stewart R. Pollock
                                     One of Plaintiff's Attorneys

10

11                                 Stewart R. Pollock (SBN – 301356)
                               spollock@edelson.com

12                                 Rafey S. Balabanian*
                               rbalabanian@edelson.com

13                                 EDELSON PC
                               123 Townsend Street

14                                 San Francisco, California 94107
                               Tel: 415.212.9300

15                                 Fax: 415.373.9435

16                                 Jeff Raizner*
                               jraizner@raiznerlaw.com

17                                 RAIZNER SLANIA LLP
                               2402 Dunlavy Street

18                                 Houston, Texas 77006
                               Tel: 713.554.9099

19                                 Fax: 713.554.9098

20                                 * *Pro hac vice* application to be filed.

21

22

23

24

25

26

27

28